Filed 12/19/24  Camarillo Sanitary Dist. v. Cal. Regional Water Quality etc. CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| CAMARILLO SANITARY DISTRICT,<br><br>    Petitioner and Appellant,<br><br>v.<br><br>CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD - LOS ANGELES REGION,<br><br>    Respondent. | 2d Civ. No. B333420<br>(Super. Ct. No. 56-2021-00549601-CU-WM-VTA)<br>(Ventura County) |

Camarillo Sanitary District (Camarillo) treats wastewater and discharges into the Calleguas Creek Watershed.  Pursuant to state and federal law, the California Regional Water Quality Control Board, Los Angeles Region (Regional Board) issued a permit regulating Camarillo.  Through a petition for writ of

mandate, Camarillo challenged portions of that permit. The trial court denied Camarillo's petition.

We will reverse the trial court's order granting the Regional Board's motion to strike to the extent it eliminated Camarillo's claim that wet and dry weather effluent limits for boron lacked reasonable potential and adequate justification. We will remand for further proceedings on that issue. We will otherwise affirm.

STATUTORY BACKGROUND

"California cases have repeatedly explained the complicated web of federal and state laws and regulations concerning water pollution . . . ." (*City of Rancho Cucamonga v. Regional Water Quality Control Bd.* (2006) 135 Cal.App.4th 1377, 1380 (*City of Rancho Cucamonga*.)  The federal Clean Water Act is a "'comprehensive water quality statute designed to "restore and maintain the chemical, physical, and biological integrity of the Nations waters."'" (*City of Burbank v. State Water Resources Control Bd.* (2005) 35 Cal.4th 613, 620 (*City of Burbank*).)

"The Clean Water Act prohibits the discharge of pollutants through a 'point source' [e.g., Camarillo] into navigable waters unless the discharge is pursuant to a National Pollutant Discharge Elimination System (NPDES) permit." (*City of Duarte v. State Water Resources Control Bd.* (2021) 60 Cal.App.5th 258, 265 (*City of Duarte*).)  "'NPDES permits establish effluent limitations for the polluter.'" (*Communities for a Better Environment v. State Water Resources Control Bd.* (2005) 132 Cal.App.4th 1313, 1320.)  Effluent limitations, in turn, "are restrictions on the 'quantities, rates, and concentrations of chemical, physical, biological, and other constituents' . . . ." (*City of Burbank*, *supra*, 35 Cal.4th at p. 620.)  "The EPA [Environmental Protection Agency] may allow states to adopt and

2

administer NPDES permit programs [citation], and it has authorized California to administer such a program." (*City of Arcadia v. State Water Resources Control Bd.* (2006) 135 Cal.App.4th 1392, 1405 (*City of Arcadia I*).)

California's Porter-Cologne Water Quality Control Act (Wat. Code, § 13000 et seq.) "establishes a statewide program for water quality control. Nine regional boards, overseen by the State Board, administer the program in their respective regions." (*City of Rancho Cucamonga*, *supra*, 135 Cal.App.4th at p. 1381.) The federal Clean Water Act "requires all states to identify polluted water bodies within their jurisdictions." (*Conway v. State Water Resources Control Bd.* (2015) 235 Cal.App.4th 671, 675; 33 U.S.C. § 1313, subd. (d).) "For all such water bodies the state must set 'total maximum daily load[s] [TMDL].'" (*Conway*, at p. 675.) "'A TMDL defines the specified maximum amount of a pollutant which can be discharged or "loaded" into the waters at issue from all combined sources.'" (*City of Arcadia I*, *supra*, 135 Cal.App.4th at p. 1404.) A regional board can establish a TMDL by amending the "basin plan," which is the regional board's water quality control plan. (*Conway*, at p. 675.)

A TMDL assigns each point source (e.g., Camarillo) a waste load allocation, "'which is that portion of the TMDL's total pollutant load . . . allocated to a point source for which an NPDES permit is required. [Citation.] Once a TMDL is developed, effluent limitations in NPDES permits must be consistent with the [waste load allocations] in the TMDL.'" (*City of Arcadia I*, *supra*, 135 Cal.App.4th at p. 1404.)

Federal law also requires NPDES permits to set water quality based effluent limitations (WQBELs) "whenever the permitting agency determines that pollutants 'are or may be

discharged at a level which will cause, . . . *have the reasonable potential to cause*, *or contribute to* an excursion above any State water quality standard, [including narrative criteria[1] for water quality].'" (*Communities for a Better Environment v. State Water Resources Control Bd.* (2003) 109 Cal.App.4th 1089, 1094 (*Communities for a Better Environment*); 40 C.F.R. § 122.44, subd. (d)(1)(i).) "Simply put, WQBELs implement water quality standards." (*Communities for a Better Environment*, at p. 1094, fn. omitted.) Wasteload allocations in TMDLs "constitute a type of water quality-based effluent limitation [WQBEL]." (40 C.F.R. § 130.2, subd. (h).)

FACTUAL AND PROCEDURAL BACKGROUND

In 2019, the Regional Board issued Camarillo an NPDES permit. The Regional Board set numeric WQBELs for both chronic toxicity and salts. The permit discussed both the Salts and Toxicity TMDLs for the Calleguas Creek Watershed, into which Camarillo discharges. The permit required chronic toxicity to be evaluated using the Test of Significant Toxicity approach.

After the 2019 permit's issuance, Camarillo filed a petition for review with the State Water Resources Control Board. Camarillo had already filed petitions for review of its 2014 permit and a 2015 amendment thereto. After initially being held in abeyance, all three petitions were ultimately dismissed by

---

[1] "Narrative criteria are broad statements of desirable water quality goals in a water quality plan. For example, 'no toxic pollutants in toxic amounts' would be a narrative description. This contrasts with numeric criteria, which detail specific pollutant concentrations, such as parts per million of a particular substance." (*City of Burbank, supra*, 35 Cal.4th at p. 622, fn. 4.)

4

operation of law after the State Board declined to act within the requisite period.

On February 18, 2021, Camarillo filed a petition for writ of mandate and complaint for declaratory and injunctive relief. (Wat. Code, § 13330; Code Civ. Proc., § 1094.5.)  After the trial court granted almost the entirety of the Regional Board's motion to strike, Camarillo filed a second amended petition for writ of mandate.  In an August 2023 written ruling, the trial court denied the petition.

## STANDARD OF REVIEW

Parties can seek review of NPDES permits through a petition for administrative mandamus in the superior court. (*Voices of the Wetlands v. State Water Resources Control Bd.* (2011) 52 Cal.4th 499, 516 (*Voices of the Wetlands*); Code Civ. Proc., § 1094.5; Wat. Code, §§ 13320, 13330.)  The inquiry extends to whether "the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion."  (Code Civ. Proc., § 1094.5, subd. (b).)  "Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence."  (*Ibid.*)

"In the mandamus proceeding, the superior court is obliged to exercise its independent judgment on the evidence before the administrative agency . . . ."  (*Voices of the Wetlands*, *supra*, 52 Cal.4th at p. 516; Wat. Code, § 13330, subd. (e).)  In such cases, "[w]here it is claimed that the findings are not supported by the evidence . . . abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence."  (Code Civ. Proc., § 1094.5, subd. (c); see also

5

*Asociacion de Gente Unida por el Agua v. Central Valley Regional Water Quality Control Bd.* (2012) 210 Cal.App.4th 1255, 1267.)

We review the trial court's factual findings for substantial evidence and its legal conclusions de novo. (*City of Duarte*, *supra*, 60 Cal.App.5th at pp. 268-269.) We also review de novo the application of law to undisputed facts. (*Guardianship of Saul H.* (2022) 13 Cal.5th 827, 847.)

"'[W]e are not bound by the legal determinations made by the state or regional agencies or by the trial court. [Citation.] But we must give appropriate consideration to an administrative agency's expertise underlying its interpretation of an applicable statute.'" (*Coastal Environmental Rights Foundation v. California Regional Water Quality Control Bd.* (2017) 12 Cal.App.5th 178, 190.) The California Supreme Court has stated the deference due an agency interpretation is fundamentally situational and "turns on a legally informed, commonsense assessment of [its] contextual merit." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 14 (*Yamaha*).)

*Yamaha* drew heavily from the United States Supreme Court's decision in *Skidmore v. Swift & Co.* (1944) 323 U.S. 134 [89 L.Ed. 124] (*Skidmore*).) There, the Court held the weight of an agency's judgment "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." (*Id.* at p. 140; *Yamaha, supra,* 19 Cal.4th at pp. 14-15; see also *Loper Bright Enterprises v. Raimondo* (2024) 144 S.Ct. 2244, 2267 [219 L.Ed.2d 832] (*Loper*) [invoking *Skidmore*].)

6

DISCUSSION[2]

*Test of Significant Toxicity*

Camarillo asserts the Regional Board's use of Test of Significant Toxicity (TST) conflicts with the federal rules, particularly 40 C.F.R. part 136. We disagree.

TST is a statistical approach for analyzing and interpreting whole effluent toxicity data. In essence, TST compares the biological effects of a discharger's effluent (e.g., on an aquatic organism's survival, growth, reproduction) with a control to evaluate toxicity. Camarillo argues 40 C.F.R. section 136.3, subd. (a) Table IA does not authorize TST. However, that provision prescribes methods for generating whole effluent toxicity data. TST is a statistical means of analyzing such data—not a means of creating it. EPA has addressed this point: "The TST is not a WET [whole effluent toxicity] test method; but rather a statistical approach that can be used to assess valid WET test data from any of the EPA approved WET test methods." (EPA Response to Comments on Proposed Rule (EPA-HQ-OW-2014-0797).)

The federal rules support EPA's interpretation. A methods manual incorporated into 40 C.F.R. part 136 states: "The statistical methods recommended in this manual are not the only possible methods of statistical analysis." (See *Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2021) 8 F.4th 831, 834.) Thus, the federal rules contemplate the use of different statistical methods. TST is one such method.

---

[2] Throughout our discussion section, we decline to address "arguments raised for the first time in [Camarillo's] reply brief." (*Committee to Relocate Marilyn v. City of Palm Springs* (2023) 88 Cal.App.5th 607, 636, fn. 8.)

7

The record indicates TST is a reliable statistical approach. EPA has issued an implementation document hailing TST as "yield[ing] a rigorous statistical interpretation of [whole effluent toxicity] data . . . ." (National Pollutant Discharge Elimination System Test of Significant Toxicity Implementation Document (EPA 833-R-10-003 June/2010) p. vii.) According to EPA, TST allows for the minimization of both false negatives and false positives. (*Id.* at p. 4.) EPA reports that "[m]ore than 2,000 [whole effluent toxicity] test results and more than one million simulations were conducted to develop the technical basis for the TST approach." (*Id.* at p. vii.) A 2011 study attests to the robustness of TST. (Effluent, Stormwater, and Ambient Toxicity Test Drive Analysis of the Test of Significant Toxicity (TST): California State Water Resources Control Board, Dec. 2011.) Given these facts, it is unsurprising that, in 2015, EPA expressed clear support for use of TST in an NPDES permit for Camarillo.

An agency's guidance "does not 'have the force and effect of law.'" (*Family Health Centers of San Diego v. State Dept. of Health Care Services* (2023) 15 Cal.5th 1, 12.) We must exercise our independent judgment in determining the meaning of the federal statutory provisions at issue. (*Loper*, *supra*, 144 S.Ct. at p. 2262.) However, "[i]n exercising such judgment, [we] may . . . seek aid from the interpretations of those responsible for implementing particular statutes. Such interpretations 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance' . . . ." (*Ibid.*, quoting *Skidmore*, *supra*, 323 U.S. at p. 140.) Given the value of expertise in this area, we find persuasive EPA's guidance and interpretation, which appropriately reflects the federal rules and is manifestly based on a studied consideration of the issues.

(*Id*. at p. 2267 [noting agency expertise "has always been one of the factors which may give an Executive Branch interpretation particular 'power to persuade, if lacking power to control'"].)

Camarillo also claims the Regional Board misused two EPA guidance documents—the TST implementation document and the Toxicity Training Tool. As Camarillo itself notes, however, these guidance documents are not binding upon the Regional Board. Indeed, the Toxicity Training Tool states that it "does not impose legally binding requirements on EPA, States, or NDPES permittees, and may not apply in site-specific situations based upon the circumstances." The TST implementation document contains similar disclaiming language. Thus, putative disparities between Camarillo's permit and the guidance do not afford grounds for relief. Furthermore, the Regional Board did not misuse the guidance to overrule federal law. Instead, it relied on guidance to help craft permit conditions in compliance with the law.

Camarillo notes that not only does the guidance discuss mixing zones, but the Basin Plan expressly authorizes them. The state's Policy for Implementation of Toxic Standards for Inland Surface Waters, Enclosed Bays, and Estuaries of California (SIP) defines a mixing zone as "a limited volume of receiving water that is allocated for mixing with a wastewater discharge where water quality criteria can be exceeded without causing adverse effects to the overall water body." While the Basin Plan allows for mixing zones, it does not uniformly require them. Instead, it provides: "On a case-by-case basis, following the completion of an approved dilution or mixing zone study, the Regional Water Board can allow a mixing zone for compliance with water quality objectives . . . ." Likewise, per the SIP, regional boards "may

9

grant" mixing zones and "[t]he allowance of mixing zones is discretionary and shall be determined on a discharge-by-discharge basis." Given this latitude, Camarillo has not shown abuse of discretion. An option's mere existence does not establish such abuse.

*Reasonable Potential Analysis for Chronic Toxicity*

Camarillo contends the Regional Board failed to conduct a proper reasonable potential analysis before including water quality-based effluent limitations (WQBELs). Camarillo asserts the Regional Board unjustifiably relied "on a dated Toxicity TMDL data from the early 1990s . . . ." Camarillo maintains the chronic toxicity effluent limits must be "invalidated as contrary to law and a prejudicial abuse of the Regional Board's discretion." We disagree.

40 Code of Federal Regulations section 122.44, subdivision (d)(1)(i) provides for WQBELs if the Regional Board determines pollutants "are or may be discharged at a level which will cause, have the reasonable potential to cause, or contribute to an excursion above any State water quality standard, including State narrative criteria for water quality." Here, the Regional Board concluded that, given the existing Toxicity TMDL, "a separate reasonable potential analysis" was unnecessary at the permitting stage. Both EPA's NPDES Permit Writer's Manual and the Basin Plan support this approach. We reject Camarillo's argument that this portion of the Basin Plan purports to overrule federal law. 40 Code of Federal Regulations section 122.44 does not prohibit reliance on a TMDL to determine reasonable potential. Indeed, the federal rules require consistency between WQBELs and "the assumptions and requirements of any available wasteload allocation for the discharge," as established

10

in a TMDL.  (40 C.F.R. § 122.44, subd. (d)(1)(vii)(B).)  Although the Toxicity TMDL was issued in 2005, we cannot say the Regional Board abused its discretion in relying on that document's thorough analysis to satisfy the relatively low threshold of reasonable potential.

*Alleged Conflict With Toxicity TMDL*

Camarillo asserts the permit's chronic toxicity limits conflict with the Toxicity TMDL.  We again disagree.

As indicated above, the federal rules require WQBELs that are "consistent with the assumptions and requirements of any available wasteload allocation for the discharge . . . ."  (40 C.F.R. § 122.44, subd. (d)(1)(vii)(B).)  But consistency does not mean identity.  Thus, a permit's effluent limits need not be identical in all respects to wasteload allocations in a TMDL.  Here, the Toxicity TMDL also provides:  "The toxicity WLAs [wasteload allocations] will be implemented in accordance with US EPA, State Board and Regional Board resolutions, guidance and policy at the time of permit issuance or renewal."  This elastic language allows for inclusion of new methods, such as TST.

Camarillo nonetheless objects to the use of TST "instead of the TMDL-prescribed target of 1" chronic toxicity unit (TUc).  A TUc of one means that the discharge in question, when undiluted, causes no demonstrable harm to organisms.  (See *Edison Elec. Inst. v. EPA* (2004) 391 F.3d 1267, 1270-1271.)  Similarly, TST asks whether discharge results in a worse organism response compared to a control.  These approaches are entirely consistent.

Camarillo asserts the TMDL is a regulation that includes "the use of a trigger instead of a numeric effluent limit for toxicity."  However, 2010 EPA guidance provides for the use of

11

TST to implement effluent limits in NPDES permits. The TMDL contemplates implementation in accordance with evolving EPA guidance.

Camarillo contends the Regional Board should have revisited or reopened the Toxicity TMDL "[i]f ambient toxicity issues were still present in 2019 when Camarillo's Permit was issued . . . ." Camarillo maintains the Toxicity TMDL anticipated that "full compliance" with all wasteload allocations and load allocations would occur by 2018 or earlier. But Camarillo fails to cite a provision that *requires* reopener if full compliance is not achieved. Absent such a requirement, Camarillo has not shown the Regional Board acted improperly in declining to reopen the Toxicity TMDL.

*Alleged Failure to Follow State Water Board Precedent*

Camarillo argues the Regional Board unlawfully failed to follow State Water Board precedent when it included numeric effluent limitations for chronic toxicity in Camarillo's permit. We conclude otherwise.

The State Board orders do not create a blanket prohibition against numeric effluent limits for chronic toxicity. In Order WQO 2003-0012, pg. 9 (*Los Coyotes / Long Beach*), the State Board concluded the issue of "numeric effluent limitations for chronic toxicity in NPDES permits for publicly-owned treatment works that discharge into inland waters" should be considered in a regulatory setting. The State Board expressed an intent to modify the state implementation plan to address the issue. While the State Board did remove the numeric effluent limitations in the permits under consideration, the State Board "decline[d] to make a determination . . . regarding the propriety of the final numeric effluent limitations for chronic toxicity contained in

12

[those] permits." In Order WQO 2003-0013, the State Board relied upon *Los Coyotes/Long Beach* to remove numeric limitations from another NPDES permit.[3]

Order WQO 2008-0008 (*City of Davis*) casts the *Los Coyotes/Long Beach* decision in broad terms: "In Order WQO 2003-012, we stated that, pending adoption of a policy, it was not appropriate to include final numeric effluent limitations for chronic toxicity in NPDES permits for publicly owned treatment works . . . ." (*Id.*, pg. 6.) However, in Order WQO 2012-0001, pg. 22, the State Board refrained from this broad language and described *City of Davis* in narrow terms, stating: "In that order, the Board concluded that a numeric effluent limitation for chronic toxicity was not appropriate in the permit under review . . . ." Taken together, the orders lack clear language prohibiting numeric effluent limitations for chronic toxicity in all cases.

*Maximum Daily and Monthly Median Effluent Limitations*

Camarillo asserts that inclusion of Maximum Daily Effluent Limitations (MDELs) and Monthly Median Effluent Limitations (MMELs) for chronic toxicity violated the federal rules. We reject this assertion.

40 C.F.R. section 122.45, subdivision (d)(2) provides that for publicly owned treatment works like Camarillo, effluent limitations shall, unless "impracticable," be stated as "[a]verage weekly and average monthly discharge limitations . . . ." In Camarillo's 2019 permit, the Regional Board noted EPA guidance has indicated "average alone limitations are not practical for limiting acute, chronic, and human health toxic effects." For

---

[3] On our own motion, we take judicial notice of State Water Resources Control Board Orders WQO 2003-0013, WQO 2008-0008, and WQO 2012-0001. (Evid. Code, §§ 452, subd. (c), 459.)

13

instance, as EPA's Toxicity Training Tool states, an average weekly requirement could "average out daily peak toxic concentrations for [whole effluent toxicity] and therefore, the discharge's potential for causing acute and chronic effects would be missed." Thus, EPA has recommended maximum daily effluent limitations instead of average weekly limits.

Likewise, EPA has recommended that the average monthly limit be expressed as a median monthly limit. The Regional Board acted reasonably in drawing upon these EPA recommendations to interpret and apply the federal rules, which expressly allow for flexibility based on impracticability.

As with TST, Camarillo argues the Regional Board's actions run contrary to EPA guidance. Once again, however, the Regional Board need not mechanically comply with every aspect of non-binding guidance. Thus, for example, the mere lack of a specific notation indicating how MDEL should be interpreted (i.e., as signifying the maximum test result for the month) is not dispositive. Camarillo has not shown use of MDEL or MMEL was unlawful.

*Alleged Premature Imposition of Salt Limits*

Camarillo argues imposition of salinity limits was impermissibly premature under the applicable Salts TMDL. We disagree.

The Salts TMDL includes an implementation schedule that provides for effluent limitations 15 years after the 2008 effective date of the TMDL. However, the Salts TMDL does not contemplate strict adherence to this timeline. The TMDL states: "Currently, the implementation plan is presented in phases with a tentative schedule for each phase. The implementation of projects may occur earlier than planned or begin during an

14

earlier phase." Thus, accelerating the timeline by less than the length of one NPDES permit period does not violate the plain terms of the Salts TMDL.

Both Camarillo and the Regional Board highlight each other's putative failures to comply with the TMDL. Again, the TMDL leaves ample room for variation: "The implementation actions described in the TMDL represent a range of activities that could be conducted to achieve a salts balance in the watershed. Future considerations may result in other actions being implemented rather than the options presented." Given the Salts TMDL's flexible language, Camarillo has not shown the Regional Board abused its discretion.

Camarillo also notes numeric effluent limitations were not legally required. (See *Communities for a Better Environment v. State Water Resources Control Bd*, *supra*, 109 Cal.App.4th at 1104-1105.) We fail to see how the availability of other options creates abuse of discretion in this case, especially considering the Salts TMDL's flexible implementation plan.

*Salinity Limits for Wet Weather*

Camarillo claims wet-weather effluent limits on total dissolved solids (TDS), sulfate, chloride, and boron lacked reasonable potential.[4] We will address boron in a separate section. As to TDS, sulfate, and chloride, we conclude reasonable potential existed under 40 Code of Federal Regulations section 122.44.

At the 2019 permit hearing, the chief of the municipal permitting unit stated that as to TDS, chloride, and sulfate: "Staff has determined that there is reasonable potential for

---

[4] For these constituents, the 2019 permit contains separate effluent limits for wet weather and dry weather.

[Camarillo] to cause or contribute to an exceedance of the water quality objective during wet weather." The data support this conclusion and defeat Camarillo's claim. For instance, in 2017, Camarillo would have exceeded the 2019 permit's limits for chloride and TDS every month. In 2017, Camarillo would have exceeded that permit's sulfate limit for three months. Based on effluent data from 2014 to 2019, Camarillo itself stated that TDS and chloride "routinely exceed[ed] the concentrations used for wet weather effluent limits" ultimately adopted in the 2019 permit and "sulfate has a probability of compliance of only 61.8% (considering all samples)."

Camarillo also argues the Salts TMDL does not require wet weather limits and, in fact, states "[a]ny discharges from the [publicly owned treatment works] during wet weather would be assimilated by these large storm flows and would not cause exceedances of water quality objectives." But as the Regional Board points out, the 2019 permit's wet weather limits for the contested salts are derived from elsewhere in the Basin Plan. The Salts TMDL does not nullify the remainder of the Basin Plan.

Camarillo contends the Regional Board abused its discretion by requiring wet weather concentration limits (e.g., mg/L) instead of just the TMDL's prescribed dry weather mass limits (e.g., lbs/day). Camarillo also asserts its permit "contains both dry weather mass limits and concentration-based wet weather limits early." As discussed above, however, the TMDL includes flexible language and is not the straitjacket Camarillo imagines. The Basin Plan, which expresses water quality objectives for TDS, chloride, and sulfate in terms of

concentration, justifies the permit's use of wet weather concentration limits.

40 Code of Federal Regulations section 122.45, subdivision (f)(1) does generally require mass limits. But that subdivision proceeds to set forth exceptions, including "[w]hen applicable standards and limitations are expressed in terms of other units of measurement . . . ." (40 C.F.R. § 122.45, subd. (f)(1)(ii).) Here, the Basin Plan's water quality objectives for TDS, sulfate, and chloride are expressed in terms of concentration. Thus, a mass limit exception applied, and concentration limits were, at minimum, appropriate.

Camarillo argues that, as to the wet weather concentration limits, the Regional Board failed to conduct the requisite Water Code sections 13263 and 13241 analysis specifically targeted at imposing these limits. Camarillo directs us to *City of Burbank*, *supra*, 35 Cal.4th at p. 627. Camarillo cites this case for the proposition that "where permit provisions exceeded the requirements of the federal Clean Water Act, Water Code sections 13263 and 13241 require considering section 13241 factors, including 'economic considerations.'"

Assuming the Regional Board was required to consider factors or otherwise conduct analysis under those sections, "'[i]t is presumed that official duty has been regularly performed.'" (*City of Arcadia v. State Water Resources Control Bd.* (2010) 191 Cal.App.4th 156, 177 (*City of Arcadia II*); Evid. Code, § 664.) Camarillo's cursory argument fails to overcome this presumption.

Moreover, the 2019 permit includes a section addressing the Water Code section 13241 factors. For example, as to economic considerations (Wat. Code, § 13241, subd. (d)), the permit states: "[T]he Regional Water Board has considered the

economic impact of requiring certain provisions pursuant to state law." Water Code "[s]ection 13241 does not specify how a water board must go about considering the specified factors. Nor does it require the board to make specific findings on the factors." (*City of Arcadia II*, *supra*, 191 Cal.App.4th at p. 177.)

*Motion to Strike*

Camarillo contends the trial court erroneously granted a motion to strike multiple issues from its petition. The Regional Board maintains Camarillo forfeited its argument regarding the motion to strike by failing to "develop an argument that it exhausted the struck claims . . . ." We conclude that, except as to boron and one procedural argument, Camarillo has forfeited any argument as to the motion to strike. The procedural argument does not persuade us. But we conclude the trial court erred to the extent it eliminated Camarillo's claim that the 2019 permit's wet and dry weather effluent limits for boron lacked reasonable potential and adequate justification.

The trial court granted the motion to strike numerous issues based on Camarillo's failure to exhaust administrative remedies. "'Where an administrative remedy is provided by statute, this remedy must be exhausted before the courts will act.'" (*Greene v. California Coastal Com.* (2019) 40 Cal.App.5th 1227, 1237.) This rule "'is not a matter of judicial discretion, but is a fundamental rule of procedure laid down by courts of last resort, followed under the doctrine of *stare decisis*, and binding upon all courts.'" (*Citizens for Open Government v. City of Lodi* (2006) 144 Cal.App.4th 865, 874.) The "interested party must present the *exact issue* to the administrative agency that is later asserted during litigation or on appeal. [Citation.] General objections, generalized references or unelaborated comments will

18

not suffice." (*Hagopian v. State of California* (2014) 223 Cal.App.4th 349, 371, italics added (*Hagopian*).)

Prior to filing in the superior court, Camarillo had filed three petitions for review with the State Water Board—one for its 2014 NPDES permit, a second for a 2015 amendment to that permit, and a third for its 2019 permit. (Cal. Code Regs., tit. 23, § 2050, et seq. [governing petitions for review by State Water Board].) The trial court still granted almost the entirety of the motion to strike. It stated the law "does not allow for generalized statements about issues or the incorporation of petitions that were denied by operation of law many years prior to the submission of the current petition. Petitioner's time to challenge the denials of the 2014 and 2015 petitions expired a long time ago . . . ."

While a motion to strike is generally reviewed for abuse of discretion on appeal following entry of final judgment, our review is de novo as we are considering the legal question of whether Camarillo exhausted administrative remedies. (See *Walnut Producers of California v. Diamond Foods, Inc.* (2010) 187 Cal.App.4th 634, 641; *Ferraro v. Camarlinghi* (2008) 161 Cal.App.4th 509, 529; accord *Clews Land & Livestock, LLC v. City of San Diego* (2017) 19 Cal.App.5th 161, 185.)

Camarillo claims the 2014 and 2015 petitions had not been denied by operation of law because they were being held in abeyance. Camarillo asserts the trial court's "misunderstanding of the issues and procedural history of [its] Petitions" warrants reversal of the motion to strike ruling.

We disagree. Any procedural misstatement by the trial court is immaterial because regardless of when the 2014 and 2015 petitions were denied, the 2019 petition's incorporation by

reference was insufficient to exhaust administrative remedies. The 2014/2015 petitions, which Camarillo failed to attach to its 2019 petition, challenged earlier permits. Thus, the 2014/2015 petitions could not have addressed any "exact issue" the 2019 permit presented. (*Hagopian*, *supra*, 223 Cal.App.4th at p. 371.) Furthermore, attempted incorporation of unattached documents is an insufficient "generalized reference[]" for exhaustion purposes, especially given the petitions' complexity. (*Ibid*.; see also Cal. Code Regs., tit. 23, § 2050, subd. (a)(4) [requiring the petition to contain "[a] full and complete statement of the reasons the action or failure to act was inappropriate or improper"].)

Apart from this procedural argument and boron, Camarillo's opening brief failed to adequately develop any argument challenging the trial court's ruling on the motion to strike.[5] Instead, Camarillo proffered generic statements (e.g., that it "sufficiently supported the issues it raised in its 2019 Petition") and cited its trial court briefing.

"[T]he trial court's judgment is presumed to be correct, and the appellant has the burden to prove otherwise by presenting legal authority on each point made and factual analysis, supported by appropriate citations to the material facts in the record; otherwise, the argument may be deemed forfeited." (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655.) An appellant "may not simply incorporate by reference arguments made in papers filed in the trial court, rather than briefing them on

_____

[5] As noted above, we decline to address arguments raised for the first time in Camarillo's reply brief. "'[I]t is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party.'" (*People v. Rangel* (2016) 62 Cal.4th 1192, 1218-1219.)

20

appeal." (*Id*. at p. 656.)  Here, except for boron, Camarillo's opening brief lacks sufficient factual analysis as to the complex motion to strike.  General statements and reference to its trial court briefing are inadequate.  "We are not required to develop a party's argument for it nor to search the record on our own seeking deficiencies." (*LAOSD Asbestos Cases* (2023) 87 Cal.App.5th 939, 955.)  We decline to do so here.  Except for boron and the procedural argument already discussed, Camarillo has forfeited any argument regarding the motion to strike.

As to boron, Camarillo's opening brief does contain factual analysis and explanation as to why the trial court improperly granted the motion to strike.  In its opening brief, Camarillo argued that "because the TMDL did not require boron limits and no demonstrated reasonable potential existed, Camarillo's Permit inappropriately contains boron limits for wet and dry weather, and the trial court was incorrect in striking consideration of boron in its ruling on the Motion to Strike . . . ."  Using similar language, Camarillo's 2019 State Board petition (pp. 30-31) and its first amended petition for writ of mandate and complaint (paragraph 105) both challenged the boron effluent limits as lacking reasonable potential and adequate justification. Camarillo exhausted administrative remedies as to this issue.  In light of Camarillo's arguments regarding the boron limits, we conclude prejudice requiring reversal exists.  (See *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800-803; Code Civ. Proc., § 475; Cal. Const., art. VI, § 13.)  Thus, we will reverse the order granting the motion to strike to the extent it eliminated Camarillo's claim that the wet and dry weather effluent limits for boron in its 2019 permit lacked reasonable potential and

21

adequate justification.  We will remand to the trial court for resolution of that issue.

*Challenges to Basin Plan and TMDLs*

Camarillo contends:  (1) the Regional Board's 1994 Basin Plan amendment omitting footnote (a) was unjustifiable; and (2) Camarillo may "properly challenge the adoption of the Basin Plan's toxicity and salinity objectives where the Regional Board failed to properly consider the Water Code section 13241 factors and failed to include an appropriate implementation plan and compliance schedules under Water Code section 13242, thereby later requiring TMDLs to be needed for these constituents."

In its 2019 State Water Board petition, Camarillo did not raise the arguments regarding either the omission of footnote (a) or Water Code section 13242.  The petition did include the following footnote:  "To the extent that any TMDL discussed in this Petition is itself unlawful or includes requirements contrary to law, [Camarillo] also challenges the TMDL as applied in this Permit."  However, this statement is far too general to exhaust administrative remedies.  Camarillo, therefore, failed to exhaust administrative remedies as to its footnote (a) and Water Code section 13242 arguments, and we will not consider them on appeal.  (*Conservatorship of Whitley* (2007) 155 Cal.App.4th 1447, 1463 ["'[E]xhaustion of the administrative remedy is a jurisdictional prerequisite to resort to the courts'"].)

Consistent with Water Code section 13320, Camarillo could have raised these arguments in a State Board petition via an as-applied challenge to the 2019 permit.  (See *California Assn. of Sanitation Agencies v. State Water Resources Control Bd.* (2012) 208 Cal.App.4th 1438, 1463, fn. 22 ["[A] discharger may, in effect, challenge the basin plan as applied to the discharge permit"].)  It

did not.  The State Board's prior approval of the Basin Plan or other documents did not make such a challenge futile.  The State Board might have reconsidered its position based on case facts or the arguments produced.  (*Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1080-1081 ["'The futility exception [to the rule of exhaustion] requires that the party invoking the exception "can positively state that the [agency] has declared what its ruling will be on a particular case"'"].)

Although the 2019 State Water Board petition does reference Water Code section 13241, that petition does not present the exact issue that Camarillo now propounds on appeal.  Thus, Camarillo did not exhaust administrative remedies.  But even if we assume Camarillo did exhaust this argument, it fails on the merits.  As with the challenge to concentration limits for salinity, Camarillo fails to overcome the presumption that the Regional Board regularly performed its official duty.  (Evid. Code, § 664; *City of Arcadia II*, *supra*, 191 Cal.App.4th at p. 177.)  As noted above, Water Code "[s]ection 13241 does not specify how a water board must go about considering the specified factors.  Nor does it require the board to make specific findings on the factors." (*City of Arcadia II*, at p. 177.)

*Trial Court's Degree of Deference*

Finally, Camarillo contends the trial court's decision should be overturned because the court granted the Regional Board an unjustifiable degree of deference.  We disagree.  The trial court's ruling stated certain EPA guidance "is entitled to a high level of deference to the agency's expertise and knowledge pursuant to *Wisner v. Dignity Health* [(2022) 85 Cal.App.5th 35, 47]."  In *Wisner*, the court afforded *Skidmore* deference to a guidebook

23

created by the U.S. Department of Health and Human Services. (*Wisner*, at pp. 46-47.)  The trial court's reliance on *Wisner* indicates it appropriately afforded the same *Skidmore* deference to EPA guidance.

We have reviewed all of Camarillo's remaining contentions and conclude it has not shown any other grounds for relief.

DISPOSITION

The order granting the motion to strike is reversed to the extent it eliminated Camarillo's claim that the wet and dry weather effluent limits for boron in its 2019 NPDES permit lacked reasonable potential and adequate justification.  The matter is remanded to the trial court for resolution of that issue.

The judgment is otherwise affirmed.  The parties shall bear their own costs on appeal.

<u>NOT TO BE PUBLISHED.</u>

CODY, J.

We concur:

GILBERT, P. J.

BALTODANO, J.

Henry J. Walsh, Judge
Superior Court County of Ventura

_____


Stoel Rives, Melissa A. Thorme for Petitioner and Appellant.

Rob Bonta, Attorney General, Tracy L. Winsor, Senior Assistant Attorney General, Gary E. Tavetian, Supervising Deputy Attorney General, and Benjamin P. Lempert, Deputy Attorney General, for Respondent.